**UNITED STATES DISTRICT COURT**
**FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAROL BENDIK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. _____** |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **PNC BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

1.      This action arises under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq*., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. and the Pennsylvania Human Relations Act, 43 P.S. §§ 951 *et seq*.

2.      Plaintiff is Carol Bendik, is female, currently age 57 years and resides in the Western District of Pennsylvania.

3.      Defendant, PNC Bank, is a corporation and an investment institution with offices throughout the Western District of Pennsylvania and with its principal office at The Tower at PNC Plaza, 300 Fifth Avenue, Pittsburgh, PA 15222.

## SUBJECT MATTER JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject matter of Bendik's ADEA claim pursuant to 29 U.S.C. § 626(b)-©) and 28 U.S.C. § 1337; jurisdiction over Bendik's Title VII claim under 28 U.S.C § 1331 and 28 U.S.C § 1343(a) and pendent and supplemental jurisdiction over Bendik's state law claim pursuant toe 290 U.S.C. § 1367.

5.    Venue is proper pursuant to 28 U.S.C § 1391 (b) and ©).

6.    Bendik has standing to bring this action in that she filed a timely charge before the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission alleging age and sex discrimination by PNC in December of 2016 and received the Right to Sue Letter from the EEOC on or about July 11, 2019.  This Complaint has been filed within the required 90 day window period.

## BENDIK'S EMPLOYMENT HISTORY WITH PNC

7.    Bendik, prior to her discharge, had been employed as a financial advisor at PNC for a period of 27 years, commencing in February of 1991.

8.    As a financial advisor, Bendik provided financial advice and investment opportunities to customers of PNC Bank.

9. Bendik's territory over which she engaged customers of PNC Bank for investment advice and opportunities consisted of the Lawrenceville, Murray Avenue and Bloomfield sections of the City of Pittsburgh.

10. During her employment, Bendik had attained a ranking of 4th among the approximately 15-16 advisors in the general Pittsburgh area, and a ranking of 58th out of approximately 600 financial advisors employed nationwide by PNC Bank.

11. Bendik received numerous performance awards as a result of her work performance as a financial advisor.

12. Bendik was summarily discharged on June 24, 2016 and was not provided with any written reason for her discharge.

13. At the time of her discharge, Bendik was the oldest in age of financial advisors employed by PNC Bank in the general Pittsburgh area.

14. Bendik had never received any form of discipline during her employment with PNC.

## **FACTS AND EVENTS GIVING RISE TO THIS ACTION**

15.     During her employment with PNC, financial advisors were required to complete a PNC computer based form each year indicating that during the relevant reporting year, the advisor had contacted customers who had Capital Direction Investment Accounts to generally review the investment account with the customer.

16.     Bendik never received any in-service instructions as to the specifics of completing the yearly Capital Directions form and, therefore, completed the form in the same manner each year over a period of 12 years.

17.     The computer based Capital Directions yearly reporting form utilized by Bendik did not contain any "directions" that precluded the entry of estimated customer contact dates, nor did the form contain any reference or warning regarding false entries or reference to any PNC dishonesty policy.

18.     The computer based form was not a form required by any governmental agency or FINRA, and was not a "bank record" that was a recordation of any financial transaction.

19.  Consistent with her practice over the period of 12 years, Bendik would enter either the estimated date or exact date of her yearly contact with the Capital Direction customer.  She would enter estimated dates if she was out of her branch office and in her car, for example, when she engaged the customer regarding the Capital Direction account review.  This review was not a required detail discussion and investment evaluation and was after a summary discussion between Bendik and her customer.

20.  On June 17, 2016, a senior PNC Human Relations employee (Heidi Crates) appeared along with sales manager, Christopher Battistone, at the Bloomfield PNC Branch where Bendik was at the time.  Crates told her that PNC had conducted a customer satisfaction survey and that one Capital Direction customer (GP) had reported no contact from Bendik for over 2 years.  Bendik disputed that account by Crates. Crates went on to state that by entering estimated customer contact dates on the computer form, Bendik had falsified business records.  Crates placed Bendik on administrative leave without pay. Christopher Battistone was Bendik's immediate supervisor and Crates was a supervisory person with the PNC HR Department.  At all times material, both Battistone and Crates are agents of PNC and acted within the scope of their authority so as to bind PNC.

21. Bendik obtained a written statement from GP (customer referred to by Crates) dated 9/2/16 wherein GP denies stating to anyone at PNC that Bendik had not contacted her for over 2 years. In addition, Bendik has obtained signed statements from over 20 of her Capital Direction customers attesting to regular contact from Bendik.

22. On June 24, 2016, Crates phoned Bendik and summarily discharged Bendik with no explanation. Bendik never received any written communication setting forth the reason for her termination.

23. The asserted "honesty policy" utilized by PNC as the basis for the discharge of Bendik is found in PNC's Fidelity Bonding Policy, even though no conduct attributed to Bendik resulted in any economic or financial loss to PNC.

24. In August of 2016, PNC refused to provide Bendik any information as to who conducted the alleged customer satisfaction survey, what questions were asked, a copy of the computer base form that was the alleged basis for Bendik's termination, and which customers allegedly provided adverse information regarding Bendik.

25. PNC did not provide the Pennsylvania Bureau of Employment Security with any information of any kind regarding any act of wilful misconduct by Bendik, and Bendik was awarded employment compensation benefits.

26.    PNC reported to FINRA, a non-governmental regulatory entity for financial advisors, such as Bendik, that Bendik has been terminated for dishonesty.

27.    Bendik's immediate supervisor, Battistone, initialed the alleged customer satisfaction survey and may have actually made contact with some of Bendik's customers.

28.    PNC's asserted reasons for discharging Bendik are pretexts in an attempt to disguise the real reasons of age and sex discrimination.

29.    Prior to her discharge, Bendik had meetings with her immediate supervisor, Battistone, regarding obtaining additional customer investors.  Battistone's comments and instructions in this regard were that Bendik has older customers in age and needed to capture the younger people, particularly at the Lawrenceville PNC Branch since the demographics of the Lawrenceville area had become "younger".

30.    Following Bendik's termination by Battistone and Crates,  PNC (under signature of Battistone) sent "resumes" of 2 younger male financial advisors (DS and AM) to Bendik's customers.  The year of birth for each of these younger males was 1971 and 1979 respectively.

7

31. Prior to her discharge, Bendik had spoken to CB regarding her interest in a newly adopted financial advisor retirement plan for which she would have been eligible at age 55 or approximately 1 year after her discharge. By discharging her, PNC saved the new plan the cost of a substantial benefit that would have otherwise been payable to Bendik.

32. Upon information and belief, Bendik believes, and therefore avers, that a male financial advisor (MH) had not contacted his Capital Direction customers for several years and he remains employed. In addition, in violation of PNC policy, MH utilized PR (male), who did not work for PNC Investments, to update MH's data base. PR remains employed.

33. Upon information and belief, Bendik believes, and therefore avers, that a male financial advisor (MF) had failed to contact customers. He remained employed and his accounts were transferred to CC.

34. Upon information and belief, Bendik believes, and therefore avers, that published media reports from the Johnstown area stated that (SD) a PNC male financial advisor, was arrested on or about August 15, 2017 after he was seen "banging his head off roadway asphalt", "dancing like a ballerina" and admitted to snorting $200.00 of cocaine. He was not discharged.

35. Upon information and belief, and as published in a FINRA Arbitration Award, Bendik believes, and therefore avers, that a PNC financial advisor had been reporting contact with a customer who had been deceased for several years.   He was not discharged.

36. Upon information and belief, Bendik believes, and therefore avers, that DS, a financial advisor referred to in paragraph 26 of this Complaint, had not contacted clients for several years as contained in a written statement from his clients dated 10/16/18.  DS was not terminated.

37. PNC utilized the Capital Direction yearly reporting form as a pretext to discharge Bendik while retaining favored younger male employees as financial advisors.

38. PNC unlawfully and intentionally terminated Bendik because of her age and her sex in order to place younger male financial advisors in Bendik's territory, which had undergone significant demographic changes, and to save the newly adopted pension provision a substantial sum of money should Bendik elect the new early pension option at age 55.

39. Prior to her discharge, Bendik earned in excess of $200,000.00 per year as a financial advisor.

## COUNT I
## ADEA & PHRA- AGE DISCRIMINATION

40.     Bendik incorporates by reference the allegations in Paragraphs 1 through 39 as though fully set forth herein.

41.     PNC terminated Bendik because of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §623 (a)(1) and the PHRA.

42.     PNC's violation of the ADEA and PHRA was wilful.

43.     As a direct result of PNC's age discrimination Bendik has sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out of pocket losses, including attorney fees and legal costs.

44.     As a direct result of PNC's report to FINRA of dishonesty, Bendik has sustained lost earnings capacity within the financial advisor employment community.

WHEREFORE, Bendik seeks the following relief:

   A.     Back pay, front pay and other damages in the form of lost wages, lost or reduced benefits, loss of earning capacity and prejudgment interest to the extent permitted by law;

B.      Litigation costs, expenses and attorneys' fees to the extent permitted by law;

C.      Punitive Damages;

D.      That PNC be required to change its report to FINRA as a voluntary quit;

E.      Such other and further relief as this Court deems just and proper.

## COUNT II
### SEX DISCRIMINATION UNDER TITLE VII & PHRA

45.    Bendik incorporates by reference the allegations in Paragraphs 1 through 44 as though fully set forth herein.

46.    PNC intentionally and wilfully terminated Bendik because of her sex (female) in violation of Title VII of the Civil Rights Act of 1964 as amended and the Pennsylvania Human Relations Act as amended.

47.    As a direct result of PNC's age discrimination Bendik has sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out of pocket losses, including attorney fees and legal costs.

48.    As a direct result of PNC's report to FINRA of dishonesty, Bendik has sustained lost earnings capacity within the financial advisor employment community.

**WHEREFORE**, Bendik seeks the following relief:

A.    Back pay, front pay and other damages in the form of lost wages, lost or reduced benefits, loss of earning capacity and prejudgment interest to the extent permitted by law;

B.    Litigation costs, expenses and attorneys' fees to the extent permitted by law;

C.    Punitive Damages;

D.    That PNC be required to change its report to FINRA as a voluntary quit;

E.    Such other and further relief as this Court deems just and proper.

                        **Respectfully submitted,**
                        **COOPER & LEPORE**


            **By:**    **/s/ _Daniel W. Cooper, Esquire_**
                        **Daniel W. Cooper, Esquire**
                        **PA ID 10677**
                        **Counsel for Plaintiff, Carol Bendik**
                        **302 Third Street**
                        **Carnegie, PA 15106**
                        **412-278-0912 (office)**
                        **412-505-6800 (fax)**
                        **cooperandlepore@hotmail.com**